

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

MICHAEL KALOS,                                   §
     Plaintiff,                 §
            §
vs.                                              §  CIVIL ACTION NO. 0:22-1114-MGL
            §
CEDAR FAIR SOUTHWEST, INC.,                      §
*d/b/a Carowinds*, CRAIG KENNINGTON,             §
and TIM BENZ,                                    §
      Defendants.          §

---

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## I. INTRODUCTION

Plaintiff Michael Kalos (Kalos) filed this negligence lawsuit in the York County Court of Common Pleas against Defendant Cedar Fair Southwest, Inc., doing business as Carowinds (Carowinds), as well as Defendants Craig Kennington (Kensington) and Tim Benz (Benz), two employees of Carowinds (collectively, Defendants). Kalos seeks actual and punitive damages.

Carowinds removed the matter to this Court, to which Kensington and Benz consented. The Court has diversity jurisdiction over the matter in accordance with 28 U.S.C. § 1332.

Pending before the Court is Defendants' motion for summary judgment. Having carefully considered the motion, the response, the reply, the record, and the applicable law, it is the judgment of this Court Defendants' motion for summary judgment will be granted.

## II.     FACTUAL AND PROCEDURAL HISTORY

Carowinds "contracted with Dynamic Attractions to do, among other work, an inspection of the wire rope on one of its rides in Carowinds named . . . [the] Windseeker."   Amended Complaint ¶ 6.   "As contractor[,] Dynamic Attractions had a duty to ensure . . .  the inspection of the Wind[s]eeker was done in a safe manner and in compliance with the laws and regulations of the State of South Carolina."   *Id.*

"Dynamic Attractions sub-contracted with Tech[K]now Serve [(TechKnow)] to do[,] among other work[,] an inspection of the wire rope on the . . . Windseeker."   *Id.* ¶ 7.   "[O]n March 6, 2019, [Kalos] was dispatched to Carowinds to inspect the wire rope on the Windseeker."   *Id.* ¶ 10. Carowinds employees Kensington and Benz "were designated to control the wire rope movement during the inspection."   *Id.* ¶ 11.

"[D]uring the inspection[,] the employees of [Carowinds] control the speed of the wire rope as it is being inspected."   *Id.* ¶ 13.   Kalos alleges that, "rather than move the wire rope at a safe speed for maintenance and inspection [Kensington and Benz] operated at a speed that caused [Kalos's] hand to be pulled into a pully which amputated his right hand."   *Id.* ¶ 14.   According to Kalos, "the loss of [Kalos's] hand was due and proximately caused by the negligent and reckless conduct of [Carowinds]."   *Id.* ¶ 15.

As is relevant here, after Defendants removed Kalos's lawsuit to this Court, they filed a motion for summary judgment, Kalos filed a response in opposition, and Defendants filed a reply in support.   The Court, having been fully briefed on the relevant issues, will now adjudicate Defendants' motion.

### III.    STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  The moving party bears this initial burden of informing the Court of the basis for its motions, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

"Once the moving party carries its burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response . . . must set forth specific facts showing . . . there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  If an adverse party completely fails to make an offer of proof concerning an essential element of that party's case on which that party will bear the burden of proof, then all other facts are necessarily rendered immaterial and the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322–23.  Hence, the granting of summary judgment involves a three-tier analysis.

First, the Court determines whether a genuine issue actually exists so as to necessitate a trial. Fed. R. Civ. P. 56(e).  An issue is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  Second, the Court must ascertain whether that genuine issue pertains to material facts.  Fed. R. Civ. P. 56(e).  The substantial law of the case identifies the material facts, that is, those facts that

3

potentially affect the outcome of the suit. *Anderson*, 477 U.S. at 248. Third, assuming no genuine issue exists as to the material facts, the Court will decide whether the moving party shall prevail solely as a matter of law. Fed. R. Civ. P. 56(e).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327. The primary issue is whether the material facts present a substantive disagreement as to require a trial, or whether the facts are sufficiently one-sided that one party should prevail as a matter of law. *Anderson*, 477 U.S. at 251–52. The substantive law of the case identifies which facts are material. *Id*. at 248. Only disputed facts potentially affecting the outcome of the suit under the substantive law preclude the entry of summary judgment.

IV.     **DISCUSSION AND ANALYSIS**

   A.     *Whether this Court lacks subject matter jurisdiction in accordance with the statutory employee doctrine*

The parties wait until the end of their briefs to discuss whether the Court has subject matter jurisdiction over this matter. In so doing, they end their submissions with arguments with which they should have started.

This is so because the Court must first determine whether it has subject jurisdiction over the matter before it can pass on the merits of any of the parties' claims. Absent subject matter jurisdiction, this Court lacks any adjudicative authority to proceed further. *See Ex parte McCardle*, 74 U.S. 506, 514, 7 Wall. 506 (1868) ("Without jurisdiction the [C]ourt cannot proceed at all in any

cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

On the question of the Court's subject matter jurisdiction over Kalos's claims, Defendants maintain "[t]his Court lacks subject matter jurisdiction pursuant to the statutory employee doctrine . . . .  The exclusive remedy for an injured statutory employee is the Workers' Compensation Act. Because [Kalos was a statutory employee] . . ., this Court lacks subject matter jurisdiction over [Kalos's] claims."  Defendants' Memorandum at 24 (emphasis omitted) (footnote omitted).  Kalos, on the other hand, contends he "is not a statutory employee."  Kalos's Response at 37.

As per South Carolina law, three tests are applied when determining whether the activities of a worker, other than an actual employee, are such that the worker should be classified as a statutory employee:

> (1) Is the activity an important part of the contractor's business or trade? (2) Is the activity a necessary, essential, and integral part of the contractor's trade, business, or occupation? or (3) Has the identical activity previously been performed by the contractor's employees?

*Posey v. Proper Mold & Engineering, Inc*., 661 S.E.2d 395, 399 (S.C. Ct. App. 2008).

"If the activity at issue meets even one of these three criteria, the worker qualifies as the statutory employee of the owner.  Any doubts as to a worker's status should be resolved in favor of including him or her under the Workers' Compensation Act."  *Edens v. Bellini*, 597 S.E.2d 863, 868 (S.C. Ct. App. 2004) (citations omitted).

"If a worker is properly classified as a statutory employee, his sole remedy for work-related injuries is to seek relief under the Workers' Compensation Act.  He may not maintain a negligence cause of action against his direct employer or his statutory employer."  *Id*. at 869.

"The original purpose of the statutory employee doctrine was to prevent business managers from outsourcing work for the purpose of avoiding workers' compensation costs."  *Keene v. CNA*

5

*Holdings, LLC*, 870 S.E.2d 156, 163 (S.C. 2021). But, "[t]hat purpose has nothing to do with outsourcing work for legitimate business reasons." *Id*.

"Dynamic Attractions [was] hired by Carowinds to perform a visual inspection of wire ropes to look at the wire cables on the Windseeker (and other attractions) from all angles and look for any anomalies or dangers to the rope." Defendants' Memorandum at 3 (citation omitted). "An amusement park can inspect their own cables, but typically they ask a third party to conduct the inspections." *Id*. (citation omitted).

"Benz testified that[,] as part of his job duties, he conducts a daily inspection of the Windseeker that includes a visual inspection of the wire cable." *Id*. at 7. But, "[t]he annual inspection of cables was not performed by Carowinds as Carowinds hired Dynamic Attractions to conduct such inspections." *Id*. (citation omitted).

The Supreme Court of South Carolina, in *Keene*, stated, when an employer makes a "legitimate business decision" to outsource a portion of its work, the contractors it hires to perform that work are not "statutory employees" for workers' compensation purposes. *Keene*, 870 S.E.2d at 163.

Here, Carowinds made a "legitimate business decision[,]" *id*., to outsource the annual inspection of the cables of the Windseeker. The record lacks any evidence it did so to avoid the costs of workers' compensation insurance.

Moreover, Defendants have failed to show they have satisfied any of the three tests from the *Posey* case that are applied to determine whether the activities of a worker makes him a statutory employee. As such, the Court is unable to conclude Kalos was a statutory employee of Carowinds such that the Court lacks subject matter jurisdiction over Kalos's negligence lawsuit against Defendants. *See id*. ( holding the plaintiff maintenance worker was not a statutory employee and stating, "there is no question [the defendant] made a legitimate business decision to outsource its

maintenance and repair work. [The defendant] clearly had no intention of avoiding the cost of insuring the workers who did the work against work-related injuries.").

### B.   Whether Kalos has established the duty and proximate cause elements of his negligence claim

Defendants contend "summary judgment should be awarded to Defendants due to lack of duty and a lack of proximate cause. . . .  Kalos went beyond the scope of his contracted scope of work and therefore Carowinds cannot be liable for his injury caused."  Defendants' Memorandum at 12 (emphasis omitted) (capital letters omitted).  Kalos, of course, disagrees with this assessment.

"A plaintiff, to establish a cause of action for negligence, must prove the following four elements: (1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; (3) resulting in damages to the plaintiff; and (4) damages proximately resulted from the breach of duty." *Thomasko v. Poole*, 561 S.E.2d 597, 599 (S.C. 2002).  When deciding whether a particular act is negligent, the applicable standard is what a person of ordinary reason and prudence would do under those circumstances at that time and place. *Hart v. Doe*, 198 S.E.2d 526, 529 (S.C. 1973).

The parties primarily focus on the duty and proximate cause elements of Kalos's negligence claim in their briefs.  Accordingly, the Court will discuss only those two factors below.

### 1.   Whether Kalos has established the duty element of his negligence claim

The short answer is "No."  The long answer follows.

Defendants contend "Kalos has failed to demonstrate . . .  Carowinds breached a duty of care to Kalos in failing to have any particular safety protocol in place, the absence of which was a proximate cause of [Kalos's] injury."  Defendants' Reply at 5.  They insist that "when [Carowinds's] contract with Dynamic Attractions indicated . . .  the inspection was to be a visual inspection, the inspector determines the manner in which the inspection will take place, and . . . Defendants did not know Kalos planned on touching the rope, then it cannot be [Carowinds's] duty to warn Kalos[,]

. . . if he touched the rope as it descended upward close to the sheave[,] . . . there was the potential . . . his hand could get stuck on the wire rope and pulled into the sheave." *Id*. at 5-6 (citations omitted).

Kalos, however, maintains "Carowinds had a duty to exercise reasonable care for [Kalos's] safety, which included a duty to eliminate hazardous conditions and to warn of hidden dangers of which Carowinds had knowledge." Kalos's Response at 8 (emphasis omitted). "As such," according to Kalos, "Carowinds had at minimum a duty to implement proper safety protocols and to warn Kalos of latent hazards such as the potential for an unseen abnormality in the wire rope to draw his hand into a sheave during the inspection." *Id*. at 9.

"Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law." *Cole v. Boy Scouts of Am*., 725 S.E.2d 476, 478 (S.C. 2011). "Whether a duty exists is a question of law for the Court." *Skinner v. S.C. Dep't of Transp*., 681 S.E.2d 871, 873 (2009).

"[A] subcontractor is an invitee as to a general contractor." *Larimore v. Carolina Power & Light*, 531 S.E.2d 535, 540 n.18 (S.C. Ct. App.2000) (citation omitted). "Generally, the owner of property owes an invitee or business visitor the duty of exercising reasonable or ordinary care for his safety and is liable for injuries resulting from the breach of such duty." *Singleton v. Sherer*, 659 S.E.2d 196, 205 (S.C. Ct. App. 2008).

"To recover damages for injuries caused by a dangerous or defective condition on [the defendant's premises], [the plaintiff] must show either (1) . . . the injury was caused by a specific act of the [defendant] which created the dangerous condition; or (2) . . . the [defendant] had actual or constructive knowledge of the dangerous condition and failed to remedy it." *Anderson v. Racetrac Petroleum, Inc*., 371 S.E.2d 530, 531 (S.C. 1988).

There are at least three problems with Kalos's duty arguments.  First, as per the deposition

testimony of Daniel Hutchinson (Hutchinson), of Dynamic Attractions, and the pertinent

quotes/contracts, Carowinds hired Dynamic Attractions to do a visual inspection of the cables on the

Windseeker:

> Q.    What did Carowinds specifically hire Dynamic Attractions to
>        do as far as an inspection of the Windseeker?
>
> A.    Just a visual inspection on all the cables.

Hutchinson Deposition at 13:17-21.  The quote Dynamic Attractions provided to Carowinds for the

job also lists a visual inspection.  *See* Hutchinson Deposition, Exhibit 1 ("Windseeker Visual Cable

Inspection[ ]").  In fact, even Kalos admits Carowinds "only requested a 'visual inspection[.]'"

Kalos's Response at 4.

Thereafter, Hutchinson and Thomas Hay (Hay) of TechKnow entered into a contract for

TechKnow to perform a "Visual Inspection of . . . Windseeker Cables[.]" at Carowinds.  Defendants'

Memorandum, Exhibit 1.  TechKnow then dispatched Kalos to perform the visual inspection.

"Words in a contract are to be given their usual and ordinary meaning." *Fryar v. Currin*, 312

S.E.2d 16, 18 (S.C. Ct. App. 1984).  The "Oxford English Dictionary" defines visual as "[o]f,

relating to, or affecting sight or vision; of or relating to the appearance of something when viewed[.]"

https://www.oed.com/search/dictionary/?scope=Entries&q=visual (last viewed March 17, 2024).

And, it defines inspection as "[t]he action of inspecting or looking narrowly into; careful scrutiny

or  survey;  close  or  critical  examination[.]"    https://www.oed.com/search/dictionary

/?scope=Entries&q=inspection (last visited March 17, 2024).

Or, as the Fourth Circuit has stated, "'inspect' means 'to look carefully at or over; view

closely and critically,' and 'visually' means 'by sight.'"  *Harris v. Norfolk Southern Ry. Co.*, 784

F.3d 954, 965–66 (4th Cir. 2015) (quoting Webster's Encyclopedic Unabridged Dictionary of the

English Language 987, 2127 (2001)).

Consequently, Kalos's touching the cables obviously falls well outside what the words in the quote and contract call for, which was a mere visual inspection of the cables on the Windseeker.

The second problem with Kalos's duty argument is there is plenty of evidence showing Defendants were unaware Kalos's visual inspection of the Windseeker would entail his touching the rope on it, and that doing so was ill advised.  Nevertheless, Kalos was trained by Hay to touch the rope during the inspection.

Shawn Hopkins (Hopkins), the maintenance director of Carowinds, who entered into the agreement with Dynamic Attractions on behalf of Carowinds to perform a visual cable inspection of the Windseeker,  attested as follows:

> I never in my wildest dreams ever thought . . . a cable inspector would put his hands on a cable . . .  I asked him to visual[ly] inspect . . . . I never thought  . . . I had to tell a cable inspector how to not get hurt by a cable.

Hopkins Deposition at 22:10-12, 19-21.

Benz's testimony on this issue is similar:

> Q.     Had you ever been provided information from Carowinds about any hazards associated with an inspection of wire rope on the WindSeeker?
>
> A.     In writing, no. Verbally, I mean, yes. I mean, it was a spoken-of thing. You know, you don't touch this. You know, you stay clear.  You know, it's an obvious thing.

Benz Deposition at 23:16-22.  Benz also testified he refrained from touching the wire ropes of the ride when he inspected them:

> Q.     You've touched the cables during an inspection?
>
> A.     No.
>
> Q.     Never touched them? But there's no rule one way or the other?
>
> A.     There's no rule, but it's kind of a self understood thing.  You don't really want to do that.

*Id*. at 41:4-9.

In addition to this testimony from Carowinds's employees, Hutchinson, the representative of Dynamic Attractions, who originally agreed to perform the visual inspection on the Windseeker, testified Defendants were unaware a visual inspection of the Windseeker would involve touching the ropes on the ride:

> Q.    . . . Prior to you doing your inspections at the Windseeker, did you ever tell anybody from Carowinds . . . your visual inspection would also involve touching moving cables?
>
> A.    No, I did not--I did not tell them that.

Hutchinson Deposition at 40:16-24.

Further, Kalos's own expert, Breitigam, questioned the propriety of touching the ropes or cupping the ropes as part the inspection:

> Q.    Based on your experience as a safety professional, whether it is cupping the rope or placing your hand around the rope while its moving, is that something . . . you would recommend as a safety professional?
>
> A.    No.

Breitigam Deposition at 30:17-23.

Defendants' expert, Speer, came to a similar conclusion: "Visual inspections require the use of the inspector's naked eye only. The basis for this opinion is as follows: . . . There was no need for the inspector to touch or grip the wire rope while it was moving." Speer Report at 33 (emphasis omitted).

Nevertheless, in training Kalos to conduct the visual inspection, Hay instructed Kalos to touch the wire ropes:

> Q.    Okay. Tell me, to the best . . . you can recall, what . . . Hay told you about how you were to go about inspecting the wire ropes.

          A.       So, the rope, he said, would slowly be moving.  I'd have to wear, like, a leather glove of some sort and . . .  I would gently put my hand around the rope feeling for any abnormalities, any burrs, any change in diameter of the rope, whether it decreased or increased while my hand was on the rope.  That was the extent of the instruction . . .  I received.

Kalos Deposition at 35:20-36:7.

The third difficulty with Kalos's duty argument is, as per well-settled South Carolina law, "[a]n independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work."  *Creighton v. Coligny Plaza Ltd. Partnership*, 512 S.E.2d 510, 521 (S.C. Ct. App.1998) (quoting 56 C.J.S. Master and Servant § 3(1)).

As Defendants note in their reply, "Carowinds contracted with Dynamic Attractions to perform the visual wire rope inspection of the Windseeker[,] . . .  and expected a person brought in to do a wire rope inspection would understand how the cables operated, how to conduct the inspection, and how to not get hurt by the cables."  Defendants' Reply at 7 (citation omitted).

For all these reasons, the Court is unable to say Defendants had a duty to implement safety protocols or to warn Kalos of hazards associated with touching the ropes on the Windseeker inasmuch as Kalos has failed to present any competent evidence Defendants knew he would actually touch the ropes during his visual inspection of the Windseeker.  In other words, Defendants were unaware of the dangerous condition Kalos complains of now.  As such, Kalos has failed to establish the duty element of his negligence claim against Defendants.

        **2.**       ***Whether Kalos has established the proximate cause element of his negligence claim***

Again, the short answer is "No."  The Court will detail the long answer below.

Proximate cause requires proof of: (1) causation-in-fact and (2) legal cause.  *Bramlette v. Charter–Medical–Columbia*, 393 S.E.2d 914, 916 (S.C. 1990).  To establish causation-in-fact, the

plaintiff must establish the injury would not have occurred but for the defendant's negligence; and to establish legal cause, the plaintiff must show foreseeability.  *Id*.

The test of foreseeability is whether the injury is the natural and probable consequence of the alleged negligent act.  *Koester v. Carolina Rental Ctr., Inc*., 443 S.E.2d 392, 394 (S.C. 1994).  "Where the injury complained of is not reasonably foreseeable there is no liability."  *Crolley v. Hutchins*, 387 S.E.2d 716, 717 (S.C. Ct. App.1989).

"[T]o establish actionable negligence, the plaintiff is required only to prove . . .  the negligence on the part of the defendant was at least one of the proximate, concurring causes of his injury."  *Hughes v. Children's Clinic, P. A.*, 237 S.E.2d 753 (S.C. 1977).

Defendants argue "the evidence shows a lack of proximate cause between the injury and the alleged acts of Carowinds[.]" Defendants' Memorandum at 19 (emphasis omitted) (capital letters omitted).  Defendants contend, "[b]ased on the undisputed facts, there is a lack of proximate cause connecting [Kalos's] injury to any act or omission by Carowinds or [Kensington and Benz]."  *Id*. at 20.  "Stated another way," according to Defendants, "at the summary judgment stage, there is a lack of any identifiable negligence on the part of Carowinds or [Kensington and Benz] which proximately caused [Kalos's] injury."  *Id*.

Kalos, on the other hand, states Carowinds's "actions in failing to abide by [Occupational Safety and Health Administration (OSHA)] regulations, internal policies, and industry standards, were the proximate causes of [Kalos's] injuries."  Kalos's Response at 7.  Kalos also maintains "there is sufficient evidence in the record to at minimum create a jury issue as to whether Defendants' failure to implement safety protocols, failure to warn Kalos of the hazardous condition of the wire ropes, and failure to slow the operating speed of the wire ropes were proximate causes of his injuries."  *Id*. at 22.

    **a.**  ***Whether Defendants' alleged failure to abide by OSHA regulations, internal policies, and industry standards was a proximate cause of Kalos's injuries***

The pertinent OSHA regulations here are 9 CFR 1910.146, Permit-Required Confined Spaces, and 29 CFR 1910.147, The Control of Hazardous Energy (lockout/tagout).

"In a negligence action, regulations promulgated under OSHA provide evidence of the standard of care . . . , but they neither create an implied cause of action nor establish negligence per se." *Jolly v. General Electric Company*, 869 S.E.2d 819, 843 (S.C. Ct. App. 2021) (internal quotation marks omitted) (alteration marks omitted).

Defendants insist "the confined space and lockout/tagout arguments are irrelevant as the evidence shows . . . Windseeker was not a confined space and lockout/tagout procedures apply only when a machine needs to remain inoperable during a maintenance task." Defendants Memorandum at 20. "Also," Defendants argue, "those issues were not a proximate cause of [Kalos's] injury." *Id.*

Kalos, on the other hand, states the confined spaces regulation "required Carowinds to take reasonable measures to ensure [Kalos's] safety and warn him of the hazards within the Windseeker, even if he was the direct employee of an independent contractor. Carowinds[,] by its own admission[,] never warned Kalos of any of the hazards, and there is no evidence it ever provided a job safety analysis to or received a contractor safety declaration from Kalos, [TechKnow], or Dynamic Attractions, in violation its own internal practices as well as section 1910.146." Kalos's Response at 21.

Defendants have the better argument here. Kalos has failed to submit any evidence showing any alleged violations of the above-referenced OSHA regulations resulted in his injuries. Defendants, after all, were unaware Kalos would touch the ropes during what was supposed to be a visual inspection of the Windseeker. Kalos has also failed to show his injury was foreseeable.

As such, the Court is unpersuaded Defendants' purported failure to abide by OSHA regulations was a proximate cause of Kalos's injuries.  Additionally, Kalos has neglected to establish how Defendants' alleged failure to abide by internal policies and industry standards was a proximate cause of his injuries either.

> **b.**    ***Whether Defendants' alleged failure to implement certain safety protocols was a proximate cause of Kalos's injury***

Defendant contend Kalos's "arguments on additional safety protocols ignore the fact . . . Kalos was hired as the expert to perform the inspection and . . . his act of placing his hand on the moving wire rope was the proximate cause of his injury."  Defendants' Reply at 4.

Kalos, however, claims Carowinds should have "adopt[ed] safety protocols and procedures concerning the inspection, which would have included procedures for educating and warning Kalos of the hazards associated with the job, as well as procedures for eliminating the hazards."  Kalos's Response at 7.

Although the contract called for a visual inspection, Kalos had been trained to touch the wire during the inspection.  Thus, the Court is unable to fathom how any "safety protocols and procedures concerning the inspection,"*id*, would have made any difference.

Kalos also argues, "[h]ad Carowinds employed an observer on the date of Kalos's incident, they could have stopped the movement of the Windseeker's wire ropes in the event . . . Kalos touched a wire rope." Kalos's Response at 21.  But, it is unclear how having an observer would have made any difference.  Certainly, there is no credible argument to be made an observer might have kept Kalos from touching the ropes on the Windseeker ride.

Benz's testimony helps establish this:

> Q.    What would have happened if you would have told . . . Kalos, "Don't touch the cables," and he responded, "That's how my boss trained me"?    What--I know this is somewhat speculation, but how do you rectify that?  You want him to do it one way; he's trained to do it a different way?

A.     Well, I mean, you're going back to the thing to where I 'm not going to tell you how to do your job.  You know, I mean, if you're--I mean, they were the contractor that was there to do that inspection on them cables.  If you come and tell me . . . you're going to do a rag test or, you know, a hand test or whatever, if you're comfortable with that, then that's--that's your forte, if you understand what I'm saying.  Now, where he decided to do it at, that didn't make a whole lot of sense to me, but, you know, that was his--that was his choice.  You know, he was technically supposed to be the professional on this.

Q.     So as far as he actually performed the wire inspection, that was his area of expertise and you would have deferred to him?

A.     Correct.

Benz's Deposition at 50:20-51:15.

The Court also notes, as it did before, Kalos is unable to show his injury was foreseeable.

For these reasons, the Court is unconvinced Defendants' failure to implement the safety protocols

Kalos says should have been in place was a proximate cause of Kalos's injury.

> c.     *Whether Defendants' alleged failure to warn Kalos of the dangerous condition of the wire ropes was a proximate cause of Kalos's injury*

Defendants claim they "did not have knowledge . . .  Kalos planned on touching the wire

ropes during the inspection." Defendants' Reply at 6.  Nevertheless, Kalos contends "[Carowinds's]

employees . . . indicated an awareness of the fact . . .  a 'visual inspection' includes a manual

component[.]"  Kalos's Respone at 4.

He then cites to two sections in Benz's deposition that supposedly support this statement.

But, they are totally unrelated to this argument.  *See* Benz's Deposition at 51:2-8 ("I'm not going to

tell you how to do your job. . .  If you come and tell me . . .  you're going to do a rag test or, you

know, a hand test or whatever, if you're comfortable with that, then that's--that's your forte[.]"); *see*

*also* Benz's Deposition at 53:14-18 (discussing the location of where the inspection had taken place in the past).

Kalos also points to two portions of Hutchinson's deposition to support his argument: Hutchinson Deposition 80:23-81:23, 85:6-17. But, inasmuch as Hutchinson's deposition was only forty-two pages long, and the citations are to pages eighty and eighty-five, the Court assumes the first citation, 80:23-81:23, was meant to be to Kensington's deposition.

But, like the citations to Benz's deposition, this cite fails to support Kalos's contention "[Carowinds's] employees . . . indicated an awareness of the fact . . . a 'visual inspection' includes a manual component[.]" Kalos's Response at 4. *See* Kensington's Deposition at 80:23-81:23 (testifying about the operating speed of the Windseeker during an inspection).

As to Kalos's cite to 85:6-17, Kensington's deposition ends at page eighty-two. So, the Court is unable to surmise which deposition testimony Kalos actually wants the Court to review here.

Suffice it to say, the record lacks any evidence Defendants were aware Kalos might touch the wires during the inspection. And again, Kalos has failed to show his injury was foreseeable.

It then necessarily follows Kalos is unable to show either they should have warned him of the dangerous condition of the wire ropes, or that such failure was a proximate cause of Kalos's injury.

### d.    Whether Defendants' alleged failure to slow the operating speed of the wire ropes was a proximate cause of Kalos's injury

Defendants argue "there is insufficient evidence . . . [they]were negligent in the way the speed of the Windseeker was operated for the inspection or . . . the speed of the Windseeker was a proximate cause of [Kalos's] injury." Defendants' Reply at 11. Kalos, on the other hand, maintains "Kennington and Benz had their own duties to operate the wire ropes at a speed that would not expose Kalos to an unreasonable risk of harm during his inspection[.]" Kalos's Response at 2.

According to Kalos, "there is evidence in the record indicating . . . Kennington and Benz could have slowed the wire rope to a speed that would have reduced the likelihood of injury to Kalos but failed to do so."

It is unclear how many times Kalos asked Kennington and Benz to slow the speed of the wire rope he was inspecting.  Early in the deposition, Kalos testified as follows:

> Q.  During your inspection process, did you call the gentlemen on the walkie-talkie and say, guys, this is going too fast, can you go any slower?
>
> A.  Yes.
>
> Q.  And what was the answer you got?
>
> A.  They said sure.  But the result, the ropes were still much too fast.
>
> Q.  Okay.  Did you then contact them again and say something to the effect, guys, it's still going too fast, you need to make it go slower?
>
> A.  I can't say for sure . . .  I contacted them a second time.  I'm not a hundred percent sure, but I definitely contacted them the one time.
>
> Q.  So you contacted them once, but you can't recall if you contacted them twice?
>
> A.  Correct.

Kalos's Deposition at 66:25-67:18.  But, later in Kalos's deposition, he testified "every time we started a new run that I would ask them to slow it down."  *Id*. at 128:11-13

So yes, Kalos testified he wanted the speed to be slower.  But, he went ahead with the inspection, even though he allegedly thought the ropes were moving too fast.

Neither one of the parties' experts suggested the speed the wire ropes were going at the time of the accident caused Kalos's injuries.  Further, Kalos has failed to present any evidence showing

a slower speed would have prevented his injuries, or what a safe speed would have been. Certainly, the Court is unable to rely on speculation and conjecture on this issue.

And again, the Court notes Kalos has neglected to establish his injury was foreseeable.

All we have here is Kalos saying he would have preferred a slower speed. But, the record lacks any evidence establishing Defendants were negligent in how they controlled the speed for the inspection. As such, the Court is of the opinion Kalos is unable to establish Defendants' alleged failure to slow the operating speed of the wire ropes was a proximate cause of his injury, especially in light of the fact they were unaware he was actually touching the wire ropes during the inspection.

* * * * *

One of the proximate causes of Kalos's injury was, of course, his touching the wire ropes during the inspection of the Windseeker while the wires ropes were moving. But, what is another primary proximate cause of his injury?

From the evidence presented to the Court, the answer seems obvious: it was the failure of his employer, TechKnow, to adequately train him. Kalos's deposition testimony makes this clear:

> Q.     Do you think you're qualified to perform an adequate
>        inspection on this wire rope?
>
> A.     I don't think I received the proper training, no.

Kalos Deposition at 130:13-17. And then, later in his deposition, he attests to the following:

> Q.     Do you think . . . if . . . Hay had given you more complete
>        and full training on how this inspection was to be conducted,
>        . . . this accident could have been avoided?
>
> A.     Yes.

Kalos Deposition at 174:9-13.

Kalos's expert, Breitigam, also testified TechKnow was responsible for Kalos's training:

> Q.     Based on your experience, would . . . Kalos's employer have
>        any responsibility for making sure  he was trained to conduct
>        his job in a safe manner?

19

A.     I do believe that, yes.

Breitigam Deposition at 32:24-33.

And, Defendants' expert, Speer, stated "[t]he proximate cause of the subject accident is the injured person, . . . Kalos, was not adequately trained by . . . [TechKnow] to conduct the visual inspection of the ride wire ropes (cables)."  Speer Report at 31.

Further, as Kalos stated in his response in opposition to Defendants' motion for summary judgment, "Kalos was specifically trained to touch the wire rope, he was not told to position himself at any specific distance from the sheaves, he was not informed of a designated safe operating speed for the wire ropes, and he was not told which platform to stand on."  Kalos's Response at 25. According to Kalos, "[t]here is no evidence . . . [Hay] ever warned [him] of the sheaves or of any snagging hazard inherent in the wire ropes."  *Id*.


* * * * *

Each of the parties offer several other reasons why they should prevail here.  But, the Court's determination Kalos has failed to establish the duty and proximate cause elements of his negligence claim against Defendants is dispositive.

Accordingly, the Court will pass on deciding the remaining arguments.  *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C. J., concurring in judgment) ("If it is not necessary to decide more to dispose of a case, then it is necessary not to decide more."); *see also Karsten v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc*., 36 F.3d 8, 11 (4th Cir. 1994) ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest dicta.").


V.     **CONCLUSION**

Consequently, based on the foregoing discussion and analysis, it is the judgment of the Court Defendants' motion for summary judgment is **GRANTED**.  As such, all other pending motions are necessarily **RENDERED AS MOOT**.

**IT IS SO ORDERED**.

Signed this 25th day of March, 2024, in Columbia, South Carolina.

/s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE